IRVING, J.,
for the Court.
¶ 1. Tammy Weatherford filed an action in the Washington County Circuit Court to recover damages for injuries she sustained when Mary Martin rear-ended a vehicle in which Weatherford was a passenger. Martin did not contest liability. After a bench trial to determine damages, the trial judge awarded Weatherford $28,058.86 in medical expenses and $368,550 in past and future pain and suffering.[1] Aggrieved, Martin appeals and asserts that the trial judge’s findings, in several respects, are not supported by substantial evidence. She also asserts that the trial judge erred in admitting into evidence life expectancy tables because they were not tendered to her prior to trial pursuant to the rules of discovery.[2]
¶ 2. Finding no reversible error, we affirm.
FACTS
¶ 3. On January 9, 1998, Martin rear-ended a vehicle in which Weatherford was a passenger. Weatherford was not wearing her seatbelt at the time.[3] Shortly after the accident, Weatherford sought treatment for head and neck pain at Delta Regional Medical Center (Delta Regional) in Greenville, Mississippi. While at the hospital, X-rays were taken of Weather-ford’s skull and facial series, and a study was made of her cervical spine. All of those test results were normal. However, she was diagnosed with a left scalp hema-toma and multiple sprains and strains.
¶ 4. A few days later, Weatherford visited Dr. Joe Pulliam, complaining of increasing spasms in her neck, as well as occasional numbness and tingling in her fingers and hands. Dr. Pulliam’s notes indicate that Weatherford’s neurological examination was normal. He recommended that she continue taking medications that she had been prescribed on the day of the accident. Weatherford saw Dr. Pulliam again in February 1998. On this visit, Dr. Pulliam concluded that the spasms in her *1255 neck had decreased significantly and that she had full range of motion. Weather-ford also had full range of motion again on March 17, 1998. At that time, Dr. Pul-liam noted that, due to her “chronic intermittent low back pain,” he planned to refer Weatherford to a specialist for further evaluation.
¶ 5. On April 13, 1998, Weatherford saw Dr. Michael Steuer, a pain management specialist. During this visit, Weatherford primarily complained of occasional headaches, shooting pain in her shoulders, and pain in her neck that radiated down into her lower back. Dr. Steuer diagnosed Weatherford with cervical and thoracic whiplash injury, myofascial syndrome, and mixed headache disorder. He also noted that Weatherford had trigger points located in the muscles adjacent to her thoracic spine. Weatherford saw Dr. Steuer on several occasions and exhibited only minimal improvement; therefore, Dr. Steuer decided to perform trigger point injections to see if Weatherford would receive any relief. Weatherford received her first trigger point injection on May 11 and returned for a follow-up visit with Dr. Steuer on May 19. On her return visit, she expressed that her lower back pain had decreased by sixty percent and did not complain of headaches on this visit. However, she complained of slight tension across the back of her shoulder blades.
¶ 6. Weatherford returned to Dr. Steuer on June 1,1998, complaining of upper back pain. As a result, Dr. Steuer performed trigger point injections in Weatherford’s right rhomboid muscle and her right shoulder blade. Dr. Steuer saw Weather-ford again on June 5, 1998. During this visit, Weatherford reported that her pain was essentially unchanged and that she was often awakened by it. Dr. Steuer increased her medication and suggested that she try physical therapy.
¶ 7. Then, on June 15, Weatherford reported that her back pain had improved by approximately fifty percent. Also, during this visit, she denied suffering from headaches. Weatherford reported significant improvement as it related to her back pain during a visit on July 21. Dr. Steuer recommended that she continue with physical therapy for another month and continue taking medications that he had previously prescribed.
¶ 8. Dr. Steuer did not see Weatherford again until September when she stated that the pain in her back had been reduced by approximately fifty percent but she also complained of right shoulder pain. Dr. Steuer prescribed her the same medications that she had previously been taking and recommended that she return in three weeks for trigger point injections. Thereafter, on October 1, 1998, Weather-ford reported that the pain in her back and shoulder had decreased by approximately sixty to sixty-five percent. On October 27, Weatherford complained of increased pain in the evenings but declined further trigger point injections, instead opting to continue physical therapy. Dr. Steuer last saw Weatherford on November 12, 1998. At this visit, her complaints remained the same as they had been on October 1 and October 27.
¶ 9. Dr. Steuer testified via deposition. He stated that he did not order any MRIs, CT scans or the like, because he elected “instead to treat her symptomatically [sic] and [would] only ... order an MRI if she failed considerably [sic] to treatment.” According to Dr. Steuer, Weatherford’s symptoms, if left untreated, would worsen.
¶ 10. Dr. Steuer was presented with Dr. Winston T. Capel’s medical notes, *1256 whom Weatherford saw on October 7, 2003.[4] Dr. Steuer testified that Dr. Ca-pel’s notes indicate that, based on Weath-erford’s history and physical examination, he diagnosed her with cervical spondylitic myelopathy and recommended that she undergo a cervical myelogram and post-mye-logram CT. When Dr. Steuer was asked whether he agreed with Dr. Capel’s findings, Dr. Steuer stated that “[i]t is a diagnosis that I might make.”
¶ 11. Further, Dr. Steuer stated that Weatherford’s problems were not caused by weight and that her symptoms developed immediately following “the trauma.” As for his opinion as it relates to Weather-ford’s X-rays taken immediately after the accident, he stated that they were essentially useless as a “diagnostic modality” because they are “non-sensitive for making a diagnosis of cervical disk [sic] and/or facet pathology.” Dr. Steuer also stated that he thought that Weatherford’s complaint of right shoulder pain “is very likely related to the cervical spinal pathology” and that Weatherford’s headache disorder, whiplash injury, and myofascial syndrome are all casually related to the accident.
¶ 12. After leaving Dr. Steuer’s care, Weatherford presented herself at King’s Daughters Hospital and Delta Regional on numerous occasions over the years that followed for pain that she claimed was associated with the accident as well as for injuries and conditions that she did not relate to the accident. For example, on September 23, 2000, she went to King’s Daughters complaining of back and right arm pain and then on November 5, 2000, she went to Delta Regional after she was hit in the jaw with a fist while attempting to break-up a fight.[5]
¶ 13. On March 28, 2003, Weatherford had an MRI taken of her cervical, thoracic, and lumbar spine. The cervical spine MRI results revealed the following: “suboptimal evaluation of the lower cervical cord secondary to motion artifact, an element of mild spinal stenosis must be considered at C5-6 and C6-7 levels. Cervical Myelo-gram with CT scanning may be of value to ascertain whether significant disease is present.” The examination of Weather-ford’s thoracic and lumbar spine showed “no evidence of disc herniation or spinal stenosis.”
¶ 14. On August 15, 2004, Weatherford went to King’s Daughters complaining of a shooting pain in her right arm and a history of back trouble. Then, on March 17, 2005, she had a second MRI of her cervical, thoracic, and lumbar spine. The impression from the MRI of her cervical spine reads as follows: “Mild to moderately significant midline disease at C4-5 through C6-7, this convex signal equivocal as to spondylosis or protruding disc. As mentioned above, better resolution on the *1257 axials would be very helpful utilizing the 1.5 tesler magnet.” The results of the examination of the thoracic spine revealed no abnormalities and the results of the examination of the lumbar spine revealed no positive findings. Weatherford had a final MRI on March 14, 2007. The results of the examination of her cervical spine revealed no significant findings. The results of the examination of her thoracic and lumbar spine were normal.
¶ 15. Weatherford was referred to Dr. Lenard Rutowski by Debbie Verble, a nurse practitioner at Delta Regional Rural Health Clinic.[6] Weatherford saw Dr. Ru-towski on March 29, 2007. Like Dr. Steuer, Dr. Rutowski provided deposition testimony. He stated that Weatherford’s basic complaints were neck pain that extended to the shoulder area and down into the third and fourth fingers on her right hand. He further stated that Weatherford expressed that she had major problems with her right side. Dr. Rutowski performed a neurological examination which revealed that Weatherford’s strength and sensation were normal and that her reflexes were symmetrical. Dr. Rutowski also pointed out that Weatherford had difficulty moving her neck to the right side and that her range of motion was diminished on the right side. He also noted that the examination did not reveal any nerve dysfunction.
¶ 16. Dr. Rutowski testified that he reviewed an MRI that Weatherford brought with her when she came to him for treatment and that he diagnosed her with sten-osis. He also testified that the diagnosis of stenosis is significant because of Weath-erford’s age.[7] Further, Dr. Rutowski was not certain whether he had reviewed the results of Weatherford’s 2003 or 2005 MRI; however, he was certain that he did not review the results of her 2007 MRI. When asked to give Weatherford’s prognosis as of March 2007, he stated responded in the following manner:
The problem I have in regards to giving you a prognosis is this. We’re dealing with '98 to '07. I don’t find anything on the exam indicating nerve dysfunction. All the symptomatology here is subjective. There’s no objective findings. The only objective finding on this evaluation is basically the films — are the films and the abnormality on the films.
Then, Dr. Rutowski was asked whether the abnormalities reflected on the film were significant. He answered by saying that:
It’s significant if, for the most part — not considering this case, but just looking at the MRI it is significant depending on symptomatology, what the findings are on the examination, and how much this interferes with the patient’s lifestyle. So in that sense it can be significant. The problem I have in this case is that here we’re nine years down the way. I can’t see it as overly significant considering the fact that there’s nothing on the exam that indicates there’s nerve dysfunction.”
As for surgery being an option for Weath-erford, Dr. Rutowski stated that “surgery is an option for her based on her sympto-matology. But in the context of the motor vehicle accident and whatever, I’m having a hard time putting that all together.” Dr. Rutowski testified that since the complaints are being made five years after the *1258 accident, he would have expected either numbness or weakness to show up on the exam or something neurological that would indicate to him that there is a significant abnormality.
¶ 17. Dr. Rutowski stated that the MRIs that were done in 2003 and 2005 were open MRIs. He explained that there is usually trouble with the quality of the film on open MRIs, as they are very sensitive and can be negatively impacted by deep breaths and movement, among other things. Dr. Rutowski explained that this is evidenced by the finding of suboptimal evaluation on the 2008 MRI and the finding on the 2005 MRI that “better resolution on the axials would be very helpful utilizing the 1.5 tesler magnet.”
¶ 18. Dr. Rutowski concluded that it is unlikely that the accident caused Weather-ford’s stenosis. Nevertheless, he testified that if Weatherford had a predisposition to spinal stenosis, then the trauma from the accident could have exacerbated the symp-tomatology. Dr. Rutowski noted that it is difficult to make a correlation between the accident and Weatherford’s symptoms because an MRI was not done within a reasonable time after the accident. Accordingly, he stated that had an MRI been done within a month or so of the accident that showed stenosis he could say that the stenosis was exacerbated by the accident. Dr. Rutowski stated that, despite the lack of an immediate post-accident MRI, he feels that there is “some correlation between the accident and [Weatherford’s] symptomatology.” According to Dr. Ru-towski, this finding is based on the fact that Weatherford’s history has remained consistent since the accident.
¶ 19. Weatherford filed an action on February 1, 1999, against Martin to recover damages for her injuries. The Washington County Circuit Court heard this case on May 17, 2007. Weatherford testified that pi’ior to the accident she had not had any muscular or nerve problems. However, she stated that she had been involved in motor vehicle accidents in either 1986 or 1987, in 1994, and in 2001. Weatherford stated that she rear-ended another vehicle in either 1986 or 1987. Weather testified that she did not receive any treatment following this accident. Then, in 1994, Weatherford was riding as a passenger in a vehicle when another driver ran a red light and hit the vehicle that she was riding in. According to Weatherford, she hit her head on the vehicle’s rear-view mirror. As a result, she went to the hospital where she was treated and released. Finally, in 2001, again while riding as a passenger in a vehicle, Weatherford was involved in a motor vehicle accident. She recalled that she suffered bruising and that she went to the emergency room where she was treated and released.
¶ 20. Weatherford also testified about how her life has changed since the 1998 accident and the steps that she takes to alleviate the pain that she experiences daily. Following the hearing, the circuit court, finding that Weatherford’s injuries and damages are uncontradicted by the record, awarded her $28,058.86 in medical expenses and $368,550 in past and future pain and suffering.
¶ 21. Additional facts, as necessary, will be related during our analysis and discussion of the issues.
ANALYSIS AND DISCUSSION OF THE ISSUES
¶ 22. “A circuit court judge sitting without a jury is accorded the same deference with regard to his findings as a chancellor, and his findings will not be *1259 reversed on appeal where they are supported by substantial, credible, and reasonable evidence.” Brewer Constr. Co. v. David Brewer Inc., 940 So.2d 921, 925(¶ 19) (Miss.2006) (quoting Donaldson v. Covington County, 846 So.2d 219, 222[2] [(¶ 11)] (Miss.2003)). Also, it is well settled that an appellate court “will respect the [trial] court’s findings of fact when they are supported by reasonable evidence in the record and are not manifestly wrong.” Allied Steel Corp. v. Cooper, 607 So.2d 113, 119 (Miss.1992). Further, it is undisputed that a trial judge is charged with determining the credibility of witnesses when he sits as the finder of fact. Yarbrough v. Camphor, 645 So.2d 867, 870 (Miss.1994).

1. Substantial Evidence

¶ 23. Martin asserts that the judgment of the circuit court should be reversed because several findings made by the trial judge are not supported by substantial evidence. We address Martin’s argument as it relates to each instance separately.

(a) Dr. Rutowski

¶ 24. In her first issue, Martin asserts that the trial judge’s findings as they relate to Dr. Rutowski are not supported by substantial evidence. First, Martin contends that the trial judge erred in finding that Dr. Rutowski reviewed Weatherford’s MRI taken on March 14, 2007. The trial judge stated the following in his findings of fact:
On March 14, 2007, Ms. Weatherford received a third MRI. On March 29, 2007, this MRI was reviewed by Dr. Rutowski, a board certified neurologist. Dr. Rutowski determined that Ms. Weatherford suffered from “mild steno-sis” or bulging disk [sic] in her cervical spine at C5-6 and C6-7. According to Dr. Rutowski, 80-90% of similar cases are caused by genetics. Dr. Rutowski recommended that Ms. Weatherford have surgery, which she has yet to undergo.
As noted, Dr. Rutowski testified that he had reviewed either Weatherford’s 2003 or 2005 MRI but definitely not her 2007 MRI. Martin contends that this is significant because the 2007 MRI did not reveal any significant findings or abnormalities, while the 2003 and 2005 MRIs do reveal abnormalities and the presence of motion ai’ti-fact or suboptimal evaluation. Nevertheless, the trial judge determined that Dr. Rutowski found that Weatherford suffered from mild stenosis or a bulging disc even though the 2007 MRI did not reveal any abnormalities.
¶ 25. We conclude that Martin correctly points out that the trial judge incorrectly stated that Dr. Rutowski reviewed Weatherford’s 2007 MRI; however, we cannot conclude that Martin was prejudiced by this finding. As noted, the MRI that Dr. Rutowski reviewed revealed abnormalities, and although Dr. Rutowski noted that the findings of the MRIs may have been compromised, he nevertheless concluded that Weatherford suffered from stenosis. Further, although he could not conclusively say that the stenosis was caused by the accident, he still felt that there was some correlation between the accident and the stenosis. It is well established that “[n]o trial is free of error; however, to require reversal the error must be of such magnitude as to leave no doubt that the appellant was unduly prejudiced.” Fielder v. Magnolia Beverage Co., 757 So.2d 925, 928(¶ 9) (Miss.1999) (citing Davis v. Singing River Elec. Power Ass’n, *1260 501 So.2d 1128, 1131 (Miss.1987)). We find the trial judge’s error harmless.
¶ 26. Martin also asserts that trial judge erred in finding that Dr. Rutowski was of the opinion that Weatherford suffered from stenosis or a bulging disc as a result of the accident. Again, Martin is correct, as Dr. Rutowski never conclusively found that Weatherford’s stenosis or bulging disc resulted from the accident. Instead, Dr. Rutowski repeatedly stated that he could not reach this conclusion with certainty because so much time had passed between the accident and the first MRI. However, Dr. Rutowski also clearly stated that although the accident may not have caused the stenosis, it could have exacerbated the stenosis if Weatherford was predisposed to developing stenosis. Although we agree that the trial judge erred in finding that Dr. Rutowski stated that the stenosis and bulging disc were caused by the accident, we find this error harmless, as Dr. Rutowski remained convinced that Weatherford suffered from stenosis that shared a correlation with the accident even though he noted that the 2003 and 2005 MRIs may have been compromised. Thus, the record contains sufficient evidence which supports the trial judge’s decision to award Weatherford medical expenses and damages for past and future pain and suffering. This issue lacks merit.
¶ 27. Martin also asserts that the trial judge erred in finding that Dr. Ru-towski recommended that Weatherford have surgery. Martin contends that the record does not bear out the trial judge’s conclusion. We agree, as the record reflects that Dr. Rutowski stated that surgery is an option that Weatherford can pursue, without specifically recommending that she have surgery. The following exchange occurred during Dr. Rutowski’s deposition:
Q. And if that is in fact the history, that she has consistently throughout complained primarily of right-sided pain, would that indicate to you, then, that the trauma sustained in the accident was more likely than not a contributing factor to the onset of her symptomatology and the problems she later developed with stenosis?
A. There can be a correlation with that if indeed, as I said before, we have documentation of no troubles prior to January of '98 and then we have symptomatology that is consistent over a period of time and documented well by individuals. The dilemma that I have, as a neurosurgeon, is that — and I think the other physicians too, because they didn’t — they can make a diagnosis just as well as I can of spinal stenosis which, based on symptomatology, could be a surgical lesion. They didn’t go the surgical approach primarily because they find examination abnormalities that they would have expected and I would have expected to show up to indicate this patient needs surgery and would be helped by the surgery.
Q. Right. The problem, as I understand it, is whoever was treating her at the time didn’t feel that it was necessary to do an MRI or, for whatever reason, didn’t see fit to do an MRI.
A. See, I guess that’s a judgment of the physician. It just becomes more of a legal issue than it is even from a physician point of view. We *1261 treat and do whatever we can. She may require surgical intervention as a last resort. That’s a possibility that she has available to her. The problem that a physician would have in doing surgery here is that we’re not dealing with the same success rate for neck surgery as would be the case if, one, it was done early; two, we had correlating symptoms or abnormalities on the films. And, like I said, we’re dealing with nine years down the way. The success rate goes down over that period of time. Once you have symptoms for that period of time, it becomes chronic. Once that diagnosis is put on, the likelihood of changing things positively go[es] down as time goes on.
(Emphasis added).
While we conclude that the trial judge erred in finding that Dr. Rutowski recommended that Weatherford have surgery, again, we find this error harmless.

(b) Continuous pain and lifestyle changes

¶ 28. Martin contends that the trial judge erred in finding that “as a result of the January 9, 1998, accident, Ms. Weatherford sustained significant injury to her neck, right shoulder, right arm, and back and has suffered almost continuous pain in her neck, shoulder, and arm.” According to Martin, Weatherford’s deposition impeaches her testimony at the hearing. We note at the outset that we have scoured the record and are unable to find Weatherford’s deposition. Therefore, it is impossible for us to address this issue in any detail except to point to Weatherford’s trial testimony wherein she testified that she was in constant pain following the accident:
Q. And when you have this pain that you’re talking about, how would you deal with it; what did you do?
A. I’d try to either stop what I was doing and lay [sic] down or change positions or whatever I needed to do, take medication; take over-the-counter medications, whatever at the time that I had. Or, if at all, as a last resort I would go to the hospital or get an injection, depending on whether or not I was seeing a pain specialist at the time.
Q. Okay. Now, we’re talking about after you were seeing [Dr.] Steuer; so I’ll just say you didn’t get anymore pain injections.
A. Right.
Q. And you’re [sic] testimony is that the pain continued?
A. Yes.
Q. And it continued from that point in time up till today?
[OBJECTION]
Q. And what would you do as far as dealing with the pain on those occasions when you weren’t under the care of a physician?
A. I would take over-the-counter medication and try to stop what I was doing to make the pain go away, lay [sic] down, if possible, if I wasn’t working; sit down if I was at work; take a break if I was at work; take my lunch hour if I was working; whatever I was able to do to stop the pain at the time.
Q. What would typically bring these— this onset of pain when you would have your good days and then go to a bad day. Was there anything that occurred or—
*1262 A. It would be just mostly being in a certain position. It could be being at work all day long; and, you know, the pain increased the longer that I was there. So with tiredness, with bagging and working and using my arm, using my neck looking down at papers; I had a lot of voids and different things that I had to approve and paperwork dealing with the money; so all of that.
¶ 29. Also, Weatherford testified that she was in pain while testifying at the hearing:
Q. Now, I’ve noticed as you’ve been sitting here testifying this morning that you’ve been sitting with your weight primarily on your left side, your left arm. Is there a reason for that?
A. Yes, sir.
Q. And what is that?
A. My right side usually is hurting. I can’t prop-up on my right side because it starts my hand to tingling. I just usually sit — it’s been so — I’ve done it for so long now, it’s just normal for me to sit this way.
As evidenced by the colloquy quoted above, Weatherford testified that she has consistently suffered from pain since the accident. Furthermore, while she receives some relief from physical therapy, injections, and other treatment, the record is clear that she is never totally pain free and experiences pain on a daily basis. This issue lacks merit, despite Martin’s assertions to the contrary.
¶ 30. Martin also argues that substantial evidence does not exist to support the trial judge’s finding that Weatherford made lifestyle changes as a result of the accident. The record contains sufficient evidence to support a finding that the pain that Weatherford experienced was either caused or exacerbated by the accident. Further, it cannot reasonably be disputed that Weatherford modified her daily activities because of the pain that she experiences. This issue lacks merit.
¶ 31. Martin also asserts that Weather-ford’s medical records do not reflect that she has consistently complained of pain in her neck and shoulders since the accident. Weatherford testified at trial that she did not complain of neck and shoulder pain on every doctor visit because “at the time, [she] did not realize [the pain] was coming from [her] neck.” We also note that Dr. Steuer’s testimony reveals that Weather-ford consistently complained of or made reference to back pain, during the time that he treated her, on some occasions stating that the pain had improved. This suggests that although the pain was better than it had previously been, it had not completely subsided. Also, as noted, Weatherford’s medical records clearly indicate that she complained of shoulder, neck, and arm pain while under the care of Drs. Steuer and Rutowski. Accordingly, we find no merit to this issue, as we conclude that substantial evidence exists to support the trial judge’s finding.

(c) Pain and Suffering Award

¶ 32. Martin argues that the trial judge’s award of $368,550 for past and future pain and suffering is not supported by substantial evidence. Martin contends that the trial judge’s award is based on erroneous findings made by the trial judge. We have already found that the trial judge’s findings are supported by substantial evidence and based on the record in its totality, the $368,550 award is also supported by substantial evidence. This issue lacks merit.

*1263
2. Life Expectancy Tables

¶ 83. In her final issue, Martin asserts that the trial judge erred in admitting life expectancy tables compiled by the United States Department of Vital Statistics into evidence because they were not produced prior to trial. At trial, Martin objected to the admission of the life expectancy tables. Then, Weatherford argued that the tables would be introduced as self-authenticating documents pursuant to Rule 902 of the Mississippi Rules of Evidence. Thereafter, the trial judge allowed the tables to be admitted into evidence. We conclude that any error committed by the trial judge was harmless, as the trial judge was permitted to take judicial notice of the information found in the tables even if they had not been admitted into evidence. See Churchill v. Pearl River Basin Dev. Dist., 757 So.2d 940; 945(¶ 19) (Miss.1999) (citing Stewart v. State, 394 So.2d 1337, 1339 (Miss.1981)). Rule 201(b) of the Mississippi Rules of Evidence provides that “[a] judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably be questioned.”
¶ 34. THE JUDGMENT OF THE WASHINGTON COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., GRIFFIS, BARNES, ISHEE, ROBERTS AND MAXWELL, JJ., CONCUR. CARLTON, J„ DISSENTS WITHOUT SEPARATE WRITTEN OPINION.

. The trial judge also awarded Richard Williams, the driver of the vehicle, $4,601.84 in medical expenses and $22,500 in past and future pain and suffering. However, Martin only appeals the trial judge's judgment as it relates to Weatherford.

. Actually, Martin raises eight issues for our review; however, we consolidate all of the issues wherein she asserts that substantial evidence does not exist to support the trial judge’s findings.

.At the time of the accident, Weatherford was employed as a cashier and video department manager at Bing’s Food Store in Green-ville, Mississippi. She continued to work at Bing’s for a while; however, at the time of the hearing she was unemployed.

. Weatherford saw Dr. Capel at the Central Mississippi Medical Center. The record does not reflect Dr. Capel’s specialty, if any. Dr. Capel stated the following regarding the MRIs that had previously been taken:
There are open MRI studies with very limited resolution. MRI of [the] cervical spine shows diffused degenerative disease. There is some suggestion of stenosis at C5-C6-7 segments although the resolution on the axial cuts are quite poor. MRI of the lumber spine shows no evidence of degenerative disc disease or compressive pathology. She does have some facet arthropathy present at L3-4, L4-5 and L5-S1. Sagittal T2 image of the thoracic spine is unremarkable.

. The record also reflects that Weatherford received treatment for sleep apnea and high blood pressure.

. The record does not reflect Dr. Rutowski's specialty, if any.

. Weatherford was thirty-six years old when she saw Dr. Rutowski.